IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| JORDAN THORNHILL, | ) | |
| | ) | Case No. |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | JURY DEMAND |
| WILLSCOT MOBILE MINI HOLDINGS CORP., | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

For her Complaint against Defendant WillScot Mobile Mini Holdings Corp. ("Defendant"), Plaintiff Jordan Thornhill ("Ms. Thornhill") states as follows:

### I. INTRODUCTION

1. This is an action for legal and equitable relief and damages for unlawful discrimination on the basis of sex under the Equal Pay Act of 1963, 29 U.S.C. § 206(d) ("EPA"), part of the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 201 *et seq.* ("FLSA"), and the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-101 *et seq.* ("THRA").

2. As alleged with greater particularity below, Defendant paid Ms. Thornhill significantly lower wages than Defendant paid to one or more similarly situated male counterparts for performing equal work, and did so on the basis of sex.

3. When Ms. Thornhill raised concerns about unequal pay, she was told that discussing pay concerns with others was "unprofessional" and that exercising her legally protected right to raise concerns about pay would cause "strife" on her team.

4. Soon after expressing her concerns to executives, including reporting her belief that

she was being retaliated against, Ms. Thornhill's employment was terminated as part of an alleged "reduction in force" based on subjective criteria and the recommendation of the manager who made the retaliatory comments.

5. These subjective criteria are a pretext for discrimination and retaliation. Indeed, Ms. Thornhill was replaced by another employee within two weeks of her termination, belying the alleged "reduction in force."

6. Based on these actions, Defendant willfully violated the EPA and THRA.

## II. JURISDICTION AND VENUE

7. This Court has original subject matter jurisdiction over Ms. Thornhill's EPA claims pursuant to 28 U.S.C. § 1331, because they arise under the laws of the United States.

8. This Court has supplemental jurisdiction over Ms. Thornhill's THRA claims pursuant to 28 U.S.C. § 1367, because they arise from a common nucleus of operative facts as the federal claims and are so related to the federal claims as to form part of the same case or controversy under Article III of the United States Constitution.

9. This Court has personal jurisdiction over Defendant because, at all relevant times, it conducted business throughout this district, including operating a physical office location and employing Ms. Thornhill within this District.

10. The employment practices alleged herein to be unlawful were committed within Davidson County, Tennessee. Therefore, proper venue for this action lies within the Middle District of Tennessee pursuant to 28 U.S.C. § 1391.

11. At all relevant times, Defendant has continuously employed employees engaged in commerce or in the production of goods for commerce within the meaning of the FLSA pursuant to 29 U.S.C. § 203(b), (i), and (j).

12. At all relevant times, Defendant has acted directly or indirectly as an employer in relation to employees and has continuously been an employer within the meaning of the FLSA, 29 U.S.C. § 203(d), and the THRA, Tenn. Code Ann. § 4-21-102(5).

13. Ms. Thornhill timely filed a Charge of Discrimination against Defendant with the U.S. Equal Employment Opportunity Commission ("EEOC") on January 16, 2023, alleging violations of the EPA and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*. ("Title VII"). She is awaiting determination of that charge and anticipates amending this Complaint to add claims under Title VII once she receives a Notice of Right to Sue from the EEOC.

### III. PARTIES

14. Ms. Thornhill is a resident of Tennessee who resides in Sumner County, within this District.

15. Defendant WillScot Mobile Mini Holdings Corp. is an Arizona for-profit corporation that conducts business in Tennessee under the assumed names "Mobile Mini" and "WillScot." Defendant may be served process through its Tennessee registered agent: C T Corporation System, 300 Montvue Road, Knoxville, TN 37919-5546.

16. At all relevant times, Defendant has continuously been conducting business in Tennessee, with their office located at 326 Weakley Lane, Smyrna, TN 37167.

### IV. FACTS

**A. Ms. Thornhill's Employment History with Defendant**

17. Defendant specializes in providing modular space and portable storage solutions for businesses.

18. Defendant employs thousands of employees, reports revenues exceeding two billion dollars per year, and is publicly traded.

3

Case 3:23-cv-00673   Document 1   Filed 07/06/23   Page 3 of 11 PageID #: 3

19. Ms. Thornhill was employed by Defendant in various sales positions from approximately July 2017 until November 2022.

20. During her employment, Ms. Thornhill was an outstanding employee, who steadily worked her way up from Local Sales Representative to Regional Account Manager to National Account Manager, one of the highest-ranking sales positions in the company.

21. Indeed, Ms. Thornhill was so successful that she was repeatedly asked to perform two jobs at once.

22. For example, from August to October 2020, Ms. Thornhill performed the roles of both Regional Account Manager (RAM) and In-House Strategic Account Manager. During this time, she managed over 80 accounts across eight states, while other RAMs managed only 2-3 states each.

23. In October 2020, Ms. Thornhill was selected, through a competitive application process, for promotion to the role of National Account Manager (NAM) at a salary of $85,000. When she tried to negotiate this salary, she was told that $85,000 was the highest she could receive. Upon information and belief, she was, at the time of her promotion, the only woman and youngest person to hold the role of NAM.

24. From approximately October 2020 to June 2021, Ms. Thornhill performed the roles of both RAM and NAM, maintaining a book of 80-plus clients for *each* role. Through Ms. Thornhill's successful efforts, both service activations and revenue grew in her regions during this timeframe.

25. Throughout Ms. Thornhill's tenure as an NAM, she was never formally disciplined or made aware of any issues with her performance.

26. Indeed, based on sales rankings released regularly by Defendant, Ms. Thornhill

was regularly in the top half of all NAMs.

### B. Ms. Thornhill Discovers and Reports Gender-Based Unequal Pay

27. In July 2022, Ms. Thornhill was driving to a work conference in Denver, Colorado, with another, male NAM named Vincenzo Sgroi.

28. Upon information and belief, Mr. Sgroi had the same education and less experience and tenure with Defendant than Ms. Thornhill. Moreover, because Ms. Thornhill long performed the roles of a NAM *and* RAM, he had less responsibility. In fact, Mr. Sgroi had applied for the same NAM role as Ms. Thornhill, with Ms. Thornhill being selected for promotion over Mr. Sgroi. About eight months later, Mr. Sgroi received a promotion to NAM.

29. During the drive, Mr. Sgroi asked Ms. Thornhill what her pay was. Ms. Thornhill told him it was a little less than $90,000. At the time, her base salary was approximately $89,000.

30. Upon hearing Ms. Thornhill's answer, Mr. Sgroi became noticeably quiet and awkward. He admitted that his base salary was $108,000, despite having the same title, responsibilities, team, and supervisor as Ms. Thornhill, but with approximately eight months' less experience in the NAM role.

31. Ms. Thornhill was shocked to hear that her male coworker was paid $19,000—or nearly 20 percent—more than she was, despite their nearly identical roles and the fact that she was more experienced and more tenured as an NAM.

32. Ms. Thornhill also knew that another NAM based in Tennessee was paid $125,000—or nearly 40 percent more than she was—despite their nearly identical roles. Upon information and belief, this individual also had similar experience, responsibility, and less tenure than Ms. Thornhill.

33. That night, Ms. Thornhill reached out to Defendant's Director of Inclusion,

Diversity, and Community and its Director of People to raise her concerns that she was being paid less than her male coworkers due to her sex.

34. In a follow-up email, Ms. Thornhill further expressed to Director of People Bradley Weaver that she believed she might face retaliation from her supervisor, Vice President of Key Accounts Amaris Surmacz, for bringing up pay issues.

35. On approximately July 27, 2022, Mr. Weaver responded to Ms. Thornhill. He confirmed both the pay differential and that Ms. Thornhill was the only woman on her team. However, he blamed the pay difference on ongoing efforts to "harmonize" organizational structures following the merger of Mobile Mini and WillScot in July 2020. He also listed several factors that could impact compensation, including years of experience, education, "negotiating skill," cost of living, and the accounts managed.

36. Ms. Thornhill responded by explaining, in detail, how she was either equally or more qualified than the other, male NAMs on her team in all the relevant factors indicated by Mr. Weaver.

37. She reported that she believed the difference in her salary was at least partially due to the fact that both her lower salary and her male coworkers' higher salaries had been set by a former manager with a history of making sexist comments, including asking if she planned to have children before he would consider her for the NAM position.

38. Mr. Weaver's response was that he would reach out to Ms. Thornhill's supervisor, Ms. Surmacz, regarding her concerns.

**C. Ms. Thornhill is Retaliated Against and Terminated Due to Her Protected Activity**

39. Approximately a week later, on or about August 5, 2022, Ms. Thornhill reported her concerns about unequal pay directly to Ms. Surmacz. She told Ms. Surmacz that, while she

was concerned about the unequal pay, she was confident that the issue would be addressed.

40. To Ms. Thornhill's surprise, Ms. Surmacz responded angrily. In their next one-on-one meeting, Ms. Surmacz accused Ms. Thornhill of "being a gossip" by discussing salaries and "causing strife" on their team. She seemed to acknowledge the pay differential but was dismissive of Ms. Thornhill's concerns.

41. During the one-on-one, Ms. Surmacz repeatedly stated that it was "unprofessional" of Ms. Thornhill to discuss her pay concerns.

42. Worse still, Ms. Surmacz impliedly threatened Ms. Thornhill for raising her concerns, stating, "Jordan, what do you expect me to do about that?", referring to Ms. Thornhill's discussing pay disparities.

43. After Ms. Thornhill reported her concerns, Ms. Surmacz began mistreating and nitpicking Ms. Thornhill's performance.

44. On or about October 17, 2022, after the unequal pay remained uncorrected for months, Ms. Thornhill reported her concerns regarding unequal pay based on sex and Ms. Surmacz's retaliatory comments to Director of National Accounts Craig Burch. She also requested a formal review of her salary.

45. Mr. Burch responded sympathetically, saying he was surprised by both the large difference in pay and Ms. Surmacz's comments. On a call, he assured Ms. Thornhill that she was secure in her job, that she was "doing great," and that he would look into the pay issue.

46. However, the next time Ms. Thornhill heard from Mr. Burch was on November 17, 2022, exactly one month later, when Mr. Burch informed her she was being terminated as part of a "reduction in force" (RIF).

47. As one of the most-tenured and a high-performing member of the team, Ms.

Thornhill was blindsided by this.

48. She asked what the metrics for the RIF were. She was told that it was "probably" key performance indicators (KPI) and an analysis of "soft skills," such as who was the "most fit for the team" and "who would be easiest to let go without disruption."

49. Following Ms. Thornhill's termination, one of Defendant's managers told Ms. Thornhill that it was well-known that Defendant used alleged "RIFs" to get rid of employees who were seen as "problematic." This same manager also stated that Ms. Surmacz has a reputation for not liking other women.

50. Despite claiming that Ms. Thornhill was terminated as part of a RIF, Defendant announced the hiring of another NAM on her former team less than two weeks later, belying any alleged "reduction."

51. Ms. Surmacz was the primary decisionmaker in Ms. Thornhill's termination based on her own, subjective criteria and "vision" for her team.

52. Defendant ratified this decision, despite Ms. Thornhill's repeatedly expressing her concerns that Ms. Surmacz was retaliating against her for her protected activity.

53. Defendant's false "RIF" was pretext for willful discrimination and retaliation against Ms. Thornhill based on her gender and for raising gender-related pay issues.

54. Defendant took no steps to address Ms. Thornhill's concerns that she was being paid less than similarly situated male coworkers due to her sex. Instead, they offered excuses that were untrue for Ms. Thornhill's situation and terminated her soon after.

55. Based on these actions, Defendant willfully violated the EPA and THRA.

## V. CAUSES OF ACTION

### A. Violation of the Fair Labor Standards Act's Equal Pay Act, 29 U.S.C. § 206(d)

56. Ms. Thornhill repeats and incorporates by reference the foregoing allegations.

57. Since at least 2020, Defendant has violated Sections 6 and 15 of the FLSA, 29 U.S.C. §§ 206(d) and 215(a)(2), by paying Ms. Thornhill lower wages than those paid to one or more male colleagues for equal work.

58. The male colleagues who were paid more than Ms. Thornhill worked as National Account Managers, the same job as Ms. Thornhill, and their positions required substantially equal (or less) skill, effort, and responsibility.

59. The male colleagues who were paid more than Ms. Thornhill worked under identical or substantially equal working conditions, including for the same supervisors, and in the same establishment as Ms. Thornhill.

60. The different compensation paid to Ms. Thornhill male colleagues were not set based on a seniority system, merit system, a system which measures earnings by quantity or quality of production, or a differential based on any other factor other than sex.

61. By paying Ms. Thornhill a base salary that substantially less than similarly situated male employees that was not based on a differential other than sex, Defendant violated the EPA.

62. By retaliating against Ms. Thornhill when she opposed unequal pay based on sex, Defendant violated the EPA.

63. Defendant is responsible for the actions of its managerial agents.

64. Defendant's conduct as described in this Complaint was a willful violation of the EPA, entitling Ms. Thornhill to liquidated damages and a three-year statute of limitations under the FLSA.

65. As a direct result of Defendant's discriminatory and retaliatory conduct, Ms. Thornhill has lost income and other privileges and benefits of employment; suffered embarrassment, humiliation, reputational harm, emotional distress and anxiety, inconvenience, and loss of enjoyment of life; and incurred attorneys' fees, costs, and litigation expenses.

**B. Violation of the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-101 *et seq*.**

66. Ms. Thornhill repeats and incorporates by reference the foregoing allegations.

67. The THRA prohibits an employer from failing or refusing to hire, discharging, limiting, segregating, classifying, depriving an individual of employment opportunities, adversely affecting the status of an employee, or otherwise discriminating against an individual with respect to compensation, terms, conditions, or privileges of employment based on her sex. Tenn. Code Ann. § 4-21-401(a).

68. The THRA further prohibits an employer from taking adverse employment actions against or discriminating against an employee in the terms and conditions of employment because of her sex, because she opposes unlawful sex discrimination, and/or because she participates in activity opposing sex discrimination. Tenn. Code Ann. § 4-21-301(a).

69. By paying Ms. Thornhill less than male coworkers based on her sex, Defendant violated the THRA.

70. By retaliating against Ms. Thornhill when she opposed discrimination based on her sex, Defendant violated the THRA.

71. Defendant is responsible for the actions of its managerial agents.

72. As a direct result of Defendant's intentionally, willfully, and/or recklessly discriminatory and retaliatory conduct, Ms. Thornhill has lost income and other privileges and benefits of employment; suffered embarrassment, humiliation, reputational harm, emotional

distress and anxiety, inconvenience, and loss of enjoyment of life; and incurred attorneys' fees, costs, and litigation expenses.

## VI. RELIEF REQUESTED

73. WHEREFORE, Ms. Thornhill respectfully requests:

   a) A jury trial;

   b) Back pay and damages for lost benefits;

   c) Compensatory damages for embarrassment, humiliation, reputational harm, emotional distress and anxiety, inconvenience, and loss of enjoyment of life;

   d) Front pay and damages for lost benefits;

   e) Liquidated damages;

   f) Attorneys' fees, costs and litigation expenses;

   g) Prejudgment interest and, if applicable, post judgment interest; and

   h) Such other and further legal or equitable relief to which she may be entitled.

Respectfully submitted,

*s/ Caraline E Rickard*
Caraline E. Rickard, TN Bar No. 034414
Curt M. Masker, TN Bar No. 037594
RICKARD MASKER, PLC
810 Dominican Drive, Suite 314
Nashville, Tennessee 37228
Telephone: (615) 200-8389
Facsimile: (615) 821-0632
caraline@maskerfirm.com
curt@maskerfirm.com

*Attorneys for Ms. Thornhill*