# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

JORDAN THORNHILL,     )
            )
  Plaintiff,      )
            )
v.           )  No. 3:23-cv-00673
            )
WILLSCOT MOBILE MINI   )
HOLDINGS CORP.,     )
            )
  Defendant.     )

## MEMORANDUM OPINION

Plaintiff Jordan Thornhill ("Thornhill") worked at WillScot Mobile Mini Holdings Corp. ("WillScot") in various sales positions before WillScot terminated her employment. In this action, Thornhill is suing WillScot under the Equal Pay Act of 1963, 29 U.S.C. § 206(d) ("EPA"), the Fair Labor Standards Act of 1938, 29 U.S.C. § 210, et seq., Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. ("Title VII"), and the Tennessee Human Rights Act, Tenn. Code Ann. § 4–21–101, et seq. ("THRA"). Thornhill alleges she suffered gender-based wage discrimination, sex discrimination, and retaliation when WillScot paid her less than her male peers without justification, and terminated her employment after she lodged complaints about the wage disparity between her and her male colleagues. Now before the Court is WillScot's Motion for Summary Judgment (Doc. No. 28), which has been fully briefed and is ripe for review (see Doc. Nos. 28, 29, 35, 38, 43). For the following reasons, WillScot's motion will be denied.

## I.     BACKGROUND AND UNDISPUTED FACTS[1]

Thornhill started working at Mobile Mini in July 2017 as an Inside Sales Representative. (Doc. No. 36 ¶ 4).  Over the following years, Mobile Mini promoted Thornhill to a Strategic Account Representative, and then to a Regional Account Manager.  (Id. ¶¶ 5–6).  In August 2020, WillScot acquired Mobile Mini.  (Id. ¶ 9).  Both companies had National Account Managers ("NAM").  Because of the merger, two sets of NAMs arose at WillScot—one set of NAMs who worked at Mobile Mini prior to its acquisition ("Mobile Mini NAMs"), and one set of NAMs who worked at WillScot prior to the acquisition ("WillScot NAMs").  (Id. ¶ 15).  In October 2020, hiring manager William Sheffield ("Sheffield") promoted Thornhill to a NAM on the Mobile Mini side of the business, and set her salary at $84,999.90.  (Id. ¶ 7; Doc. No. 31-3 at 171:13–172:13). In May 2022, WillScot hired Amaris Surmacz ("Surmacz") as the Vice President of Key Accounts (Doc. No. 36 ¶ 19), making her Thornhill's new boss.  (Id. ¶ 23).

 A few months later, Thornhill attended a work conference with her male colleague, Vincenzo Sgroi ("Sgroi").  (Id. ¶¶ 31–32).  Sgroi is another Mobile Mini NAM.  (Doc. No. 31-5 ¶ 10).  On the way to the conference, Thornhill and Sgroi discussed their compensation.  (Doc. No. 36 ¶ 32).  During that conversation, Thornhill learned that WillScot paid Sgroi a base salary of approximately $106,000.  (Id. ¶ 33).  Thornhill told Sgroi that her base salary was $89,000.[2]  (Id.). After learning Sgroi had a higher base salary than her, Thornhill raised the issue with Davida in

---

[1] The undisputed facts in this section are drawn from the undisputed portions of the parties' statements of facts (Doc. No. 36), the exhibits and depositions submitted in connection with the summary judgment briefing, and portions of the Amended Complaint ("Complaint") (Doc. No. 8) that are not contradicted by the evidence in the record.

[2] The record contains conflicting information as to Thornhill's base salary.  (See Doc. No. 36 ¶ 33 (stating base salary was $89,000); Doc. No. 31-3 at 171:13–172:13 (stating base salary was $84,999.90)).  This factual discrepancy is irrelevant for the purposes of resolving this motion, as both values are lower than most of the male Mobile Mini NAMs' base salaries.  See infra, Section III.1.A.

Human Resources.  (Id. ¶ 35).  Davida told Thornhill that she should contact Director of People,

Brad Weaver ("Weaver"), to discuss her concerns.  (Id.).

Following Davida's instructions, Thornhill emailed Weaver on July 20, 2022 to discuss the

pay differential between her and Sgroi's base salaries.  (Id. ¶ 36).  In her email, Thornhill told

Weaver:

> By recommendation, I am writing to inform you of a large difference between the
> National Account Manager salaries (Mobile Mini side) with the hopes that you will
> review this matter.
>
> Requested for Review:
> I have learned that there is a base salary difference of $16,000 between a fellow
> male NAM and myself.
>
> Additional information:
> - I have been at the company longer
> - I was promoted to the team sooner
> - Same level of education
> - Same job and responsibilities.
>
> As the first woman on the Mobile Mini National Account's team, I am saddened to
> learn of this major discrepancy between the salaries of a male colleague and my
> own.
>
> Thank you for your consideration and I hope to continue growing with this
> company and being a part of future solutions.

(Doc. No. 31-1 at 78).  A week after Thornhill emailed Weaver with her concerns, and after the

two discussed the matter over the phone, Weaver emailed Thornhill more information about how

WillScot determines compensation.  (Id. at 77).  In that email, Weaver explained:

> Compensation and determining factors are complex, and (as we are harmonizing
> many of our functions and teams across all of WillScot Mobile Mini) we are still
> very much in the process of drafting/enacting harmonized compensation strategies
> and pay ranges for our combined org.
>
> Some other factors we consider when we look at compensation:
> - *At hire, years of prior experience in a role, degrees, and negotiating skill can
>   impact starting pay.

3

- *That starting pay often drives subsequent increases and raises as they are based on percentage increases.
- *Wages are higher in some parts of the US based on cost of living differentiators (Canada too), North v. South, California or NY v. everyone else, etc.
- *In commercial roles involving account management, the scope, size, and complexity of accounts assigned is often a factor as well.

I did pull all the information that I have available to me and did connect with others who have been involved with supporting the Key Accounts Team.  Here is some additional information that I identified, and wanted to let you know prior to moving to next steps.

While you are the only female on the current NAM team, you are one of many women on the combined Key Accounts team now reporting up through Amaris.  I know since Amaris joined in May she has been working closely with the compensation team, our commercial HR Business Partner John Wargo, and S[enior] Director of People Kim Prack [("Prack")], to evaluate the 6-7 different job titles and 3-4 varied compensation structures currently in place with a goal of better harmonizing and simplifying our several legacy ranges and plans.

(Id. at 76–77).  Thornhill responded to Weaver the same day, stating:

Thank you for your email and for this information.  I am thankful to be reporting to Amaris now however, my salary was created when this was not the case.  With that in mind, our post-merger improvements do not minimize the pre-merger issues that still remain.

My issue stems from the difference between the salaries.  Various factors creating a difference of 5k-8k is one matter, but the difference of 16k and upwards of 40k is another.

I can contact Amaris tomorrow and bring this to her attention.  I am disappointed this large of a difference in salary is not being viewed as a clear issue when only two weeks ago there was a WOW meeting which included this subject.

Additional information I would like to have noted:
- The past leader who created my salary was the same person who asked if I planned to have children when it was mentioned I was interested in being a NAM, and was the same person who set the over 125k salary for a different male colleague.

- Based on my current team knowledge, I have the same level of education as the other NAMs.

- None of the NAMs live in CA or NY, and the NAM with the highest salary lives in the same state as myself while I live in the state's most expensive city.

4

- I have held the most positions within the company out of the rest of the NAMs which has provided me with a more unique skill set. I am able to use systems and work with departments some are unsure of.

- Many of the NAMs currently on the team were RAMs at the same time as myself. During this time, I managed the most states, more accounts, and was promoted to NAM sooner.

- During my time as a NAM, I have taken on multiple projects that required my doing the work of two or three different jobs. This included my managing my past RAM accounts and NAM accounts at the same time for about a year which made my account total to be over 150 accounts. During that time only my NAM accounts counted towards my bonus.

May I reach out to Amaris [Surmacz] on my own or does protocol call for you to do so instead? I want to make sure I do this right.

(Id. at 75–76). In that response, Thornhill again referenced Sgroi's higher base salary than her own. (Id.). She also referenced another male Mobile Mini NAM colleague's base salary, Jared Corby's ("Corby"), who made $125,000. (Id.; Doc. No. 36 ¶ 38; Doc. No. 31-5 ¶ 11).

Weaver responded to Thornhill's email, informing her that she could reach out to her boss, Surmacz, regarding the wage disparity issue. (Doc. No. 31-1 at 75). Weaver also stated that his team would "also be reaching out" to Surmacz on their end to "make sure she [was] aware" of Thornhill's concerns. (Id.).

On August 3, 2022, Thornhill emailed Weaver again about her pay complaint, stating:

At this time, I would like to put on hold the open case we have been discussing. I think with how much Amaris [Surmacz] is doing for the department it is fair to believe this will be addressed. I will still be speaking to her Friday on the matter to let her know of the salary difference on the NAM storage team, and I truly appreciate your assistance and due diligence on this matter.

(Doc. No. 31-1 at 74).

Two days later, Thornhill reported her pay concerns to Surmacz. (Doc. No. 36 ¶ 44). On October 17, 2022, Thornhill again discussed her pay concerns with her supervisor, Director of

5

National Accounts Craig Burch ("Burch"). (Doc. No. 37-4 at 19:15–20:20). Burch and Surmacz emailed about Thornhill's pay complaints the same day. (Doc. No. 37-5). In the email correspondence, Surmacz told Burch:

> Craig Burch – [I] was thinking more about the conversation with Jordan [Thornhill]. I think you need to alert Kim Prack and Brad [W]eaver about it as they were the ones who were communicating with her when she made the original complaint about pay. You should let them know about the conversation and how we should handle until comp [harmonization] is done[.]

(Id.).

On November 17, 2022, Burch and Prack informed Thornhill that WillScot was terminating her employment as part of a reduction in force ("RIF"). (Doc. No. 36 ¶ 63; Doc. No. 31-1 at 196:13–18). WillScot terminated Thornhill's employment at the same time it terminated Brian Lorino's ("Lorino") employment, another male Mobile Mini NAM. (Doc. No. 31-2 at 85:2–3; Doc. No. 31-5 ¶ 12). Surmacz selected both Thornhill and Lorino for termination.[3] (Doc. No. 31-2 at 85:2–6). Shortly after WillScot terminated Lorino's and Thornhill's employments, it hired Amelia Platt ("Platt") and promoted Cory Purvis ("Purvis") to replace them. (Doc. No. 36 ¶ 77).

Following her termination, Thornhill filed suit against WillScot, alleging violations of the EPA, Title VII, and the THRA. (Doc. No. 8). WillScot now moves for summary judgment. (Doc. No. 28).

## II.   LEGAL STANDARD

Summary judgment is appropriate only where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return

---

[3] Surmacz testified that she selected Thornhill and Lorino for the RIF because she did not feel they "had the skillset needed for the organization. . . moving forward." (Doc. No. 31-2 at 85:2–6). The validity of the RIF, and the reasoning for why Surmacz selected Thornhill for termination pursuant to the RIF, are both disputed.

a verdict for the nonmoving party.'" Peffer v. Stephens, 880 F.3d 256, 262 (6th Cir. 2018) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)). "The party bringing the summary judgment motion has the initial burden of informing the Court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts." Rodgers v. Banks, 344 F.3d 587, 595 (6th Cir. 2003) (internal citation omitted). "The moving party may satisfy this burden by presenting affirmative evidence that negates an element of the non-moving party's claim or by demonstrating an absence of evidence to support the non-moving party's case." Id. (internal citation and quotation marks omitted). "In response, the nonmoving party must present 'significant probative evidence' that will reveal that there is more than 'some metaphysical doubt as to the material facts.'" Miller v. Maddox, 866 F.3d 386, 389 (6th Cir. 2017) (quoting Moore v. Philip Morris Cos., Inc., 8 F.3d 335, 340 (6th Cir. 1993)).

In deciding a motion for summary judgment, the Court must review all the evidence, facts, and inferences in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal citation omitted). The Court does not, however, weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. See Anderson, 477 U.S. at 249. The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient to survive summary judgment; rather, there must be evidence on which a trier of fact could reasonably find for the non-moving party. See Rodgers, 344 F.3d at 595.

## III. ANALYSIS

WillScot argues it is entitled to summary judgment on the merits as to all of Thornhill's claims: (1) gender-based wage discrimination under the EPA, Title VII, and the THRA; (2)

retaliation under the EPA, Title VII, and the THRA; and (3) gender discrimination under Title VII and the THRA.[4]  (See Doc. No. 29).  The Court will address each issue in turn.

       1.   Gender-Based Wage Discrimination Claims

WillScot first argues that it is entitled to summary judgment on Thornhill's gender-based wage discrimination claims.  (Doc. No. 29 at 9).  The Court will first address Thornhill's EPA wage discrimination claim, followed by her Title VII and THRA wage discrimination claims.

       A.   EPA Claim

"The EPA prohibits employers from paying an employee at a rate less than that paid to an employee of the opposite sex for performing equal work."  Beck-Wilson v. Principi, 441 F.3d 353, 359 (6th Cir. 2006).  The EPA establishes a well-known three-step burden-shifting scheme.  First, Thornhill must establish her prima facie case of wage discrimination.  Schleicher v. Preferred Solutions, Inc., 831 F.3d 746, 752 (6th Cir. 2016).  If Thornhill establishes a prima facie case, WillScot bears both the burden of proof and production "that the wage differential is justified under one of the four affirmative defenses set forth under § 206(d)(1) of the Equal Pay Act: (1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality of production; or (4) any other factor other than sex."  Schleicher, 831 F.3d at 752–53 (quoting Buntin v. Breathitt Cty. Bd. of Educ., 134 F.3d 796, 799 (6th Cir. 1998)).  If WillScot satisfies its burden of production on one of the affirmative defenses, Thornhill "'must come

---

[4] Because the Tennessee "legislature intended the THRA to be coextensive with federal law," Phillips v. Interstate Hotels Corp., 974 S.W.2d 680, 683 (Tenn. 1998), such "claims are analyzed in the same manner as claims brought under Title VII of the Civil Rights Act of 1964," Marpaka v. Hefner, 289 S.W.3d 308, 313 (Tenn. Ct. App. 2008) (collecting cases).  This includes, where applicable, the McDonnell Douglas v. Green, 411 U.S. 792 (1973) burden-shifting framework that the Tennessee legislature codified for all claims filed after June 10, 2010.  Tenn. Code Ann. § 4–21–311 (2011).  Accordingly, the Court will analyze Thornhill's Title VII and THRA claims together.

8

forward with evidence demonstrating the existence of a triable issue of fact' regarding pretext.'" Id. (quoting Timmer v. Mich. Dep't of Commerce, 104 F.3d 833, 844 (6th Cir. 1997)).[5]

a. Prima Facie Case

The Court first turns to Thornhill's prima facie case of gender-based wage discrimination under the EPA. To establish a prima facie case of wage discrimination under the EPA, Thornhill must show that WillScot "paid different wages to an employee of the opposite sex for substantially equal work." Kovacevich v. Kent State University, 224 F.3d 806, 826 (6th Cir. 2000) (internal citation omitted). When evaluating the employees' work, "the label to be applied to the position is not determinative." Conti v. Universal Enterprises, Inc., 50 F. App'x 690, 697 (6th Cir. 2002). Rather, "[t]he pertinent inquiry must focus on the actual requirements and performance of the jobs in question." Id.; see Beck-Wilson, 441 F.3d at 359 ("Jobs need not be identical in order to be considered 'equal work' under the EPA."). WillScot argues that Thornhill cannot establish her prima facie case of wage discrimination for the WillScot NAMs, because she cannot point to a proper WillScot NAMs comparator who had higher wages than her, despite performing equal work. (Doc. No. 29 at 11–13). In response, Thornhill does not rely on the WillScot NAMs as comparators, instead asserting that she has established her prima facie case under the EPA "as applied to 'Mobile Mini' NAMs." (Doc. No. 35 at 11).

The Court agrees with Thornhill that she has established her prima facie case. As an initial matter, WillScot's arguments miss the point. Whether the WillScot NAMs are proper comparators for Thornhill is of no moment, given the parties agree that: (1) Thornhill was a Mobile Mini NAM;

_____

[5] Thornhill contends that WillScot does not cite the correct EPA legal standard. (Doc. No. 35 at 10 n.3; Doc. No. 43 at 1). While WillScot's EPA analysis undoubtedly leaves something to be desired, it does cite and apply the correct EPA standard. (Doc. No. 29 at 9–10). Accordingly, Thornhill's arguments on this point need not be addressed further.

9

and (2) Mobile Mini NAMs were separate and distinct from WillScot NAMs at the time of Thornhill's employment. (Doc. No. 36 ¶¶ 15–16). Thornhill need not rely on the male WillScot NAMs to make her prima facie case, as she only needs to establish that *one* of her male NAM colleagues (not *all* of them) was paid more for the same work. See Kovacevich, 224 F.3d at 826. Indeed, Thornhill has done so through comparison with many of her male Mobile Mini NAM colleagues.

First, Thornhill points to evidence that most of the male Mobile Mini NAMs working under Craig Burch, Thornhill's supervisor, made more than her and her only female colleague. (See Doc. No. 31-5 at 7 (showing all but one male NAM made had a higher base salary than Thornhill and her female colleague)). In fact, it is undisputed that WillScot set at least five male Mobile Mini NAMs' salaries at a higher base level than Thornhill's. (See Doc. No. 29 at 11–13; see also Doc. No. 36 ¶ 33, Doc. No. 31-3 at 171:13–172:13 (Thornhill's base salary was under $90,000)). WillScot set Sgroi's base salary at $105,000 (Doc. No. 31-5 ¶ 10); Corby's base salary at $136,500 (id. ¶ 11); Carlos Aguirre's base salary at $131,250 (id. ¶ 13); Michael Bedrick's base salary at $145,000 (id. ¶ 14); and Trent French's base salary at $125,000 (id. ¶ 15).

Second, Thornhill provides evidence demonstrating that all Mobile Mini NAMs—regardless of gender and base salary—had the same "actual requirements and performance" obligations. Conti, 50 F. App'x at 697. For instance, Thornhill points to Prack's testimony that there was just one Mobile Mini NAM job description requiring all Mobile Mini NAMs to perform the same basic job duties. (Doc. No. 31-3 at 176:1–9). While the Mobile Mini NAM job description is not dispositive here, see Conti, 50 F. App'x at 697, Thornhill demonstrates that the Mobile Mini NAM job description was not merely a "label," see id. Specifically, Thornhill emphasizes Prack's testimony that all Mobile Mini NAMs performed the same basic job duties in

10

practice. (Doc. 31-3 at 176:5–16). WillScot does not present any argument on whether, or why, these facts are insufficient to establish Thornhill's prima facie case.[6] (Doc. No. 29 at 11–13; Doc. No. 38 at 1–3). Considering this and viewing the facts in the light most favorable to Thornhill, the Court finds Thornhill has carried her burden of establishing her prima facie case. See Matsushita, 475 U.S. at 587.

### b. Affirmative Defense

Given Thornhill has established her prima facie case of gender-based wage discrimination, the burden shifts to WillScot to meet the burdens of both persuasion and production on one of the four affirmative defenses set forth under § 206(d)(1) of the EPA. See Schleicher, 831 F.3d at 752–53. WillScot relies on the fourth affirmative defense, arguing that the male Mobile Mini NAMs' superior experience to Thornhill's is a "factor other than sex" that explains the reason for the wage disparity. (Doc. No. 29 at 13–17). Thornhill disputes this, arguing that WillScot cannot establish its affirmative defense because "it has *no knowledge* of the factors that *actually* went into setting the salary" of any Mobile Mini NAM, male or female. (Doc. No. 35 at 13).

The Sixth Circuit has held that the EPA's "exception that a factor other than sex can be an affirmative defense 'does not include literally *any* other factor, but a factor that, at a minimum, was adopted for a legitimate business reason.'" Beck-Wilson, 441 F.3d at 365 (citing EEOC v. J.C. Penny Co., 843 F.2d 249, 253 (6th Cir. 1988)). As expected, "the burden of proving that a factor other than sex is the basis for a wage differential is a heavy one." Brennan v. Owensboro-Daviess Cnty. Hosp., City of Owensboro, Kentucky, 523 F.2d 1013, 1031 (6th Cir. 1975).

---

[6] Both parties discuss the job responsibilities of NAMs in general terms. (See generally Doc. Nos. 29, 35). This makes it particularly difficult to determine whether Thornhill and the male Mobile Mini NAMs performed the same work at WillScot. However, because WillScot does not truly dispute that Thornhill establishes her prima facie case for the Mobile Mini NAMs, the Court need not grapple with these deficiencies further for the purposes of resolving this motion.

11

"[U]nless the factor of sex provides no part of the basis for the wage differential, the requirements [for the defense] are not met." Id. (internal quotations and citation omitted). "[A]s the party who bears the burden of persuasion, the defendant who makes a motion [under Rule 56] must demonstrate that there is no genuine issue as to whether the difference in pay is due to a factor other than sex." Beck-Wilson, 441 F.3d at 365 (internal citation and quotations omitted).

Here, WillScot has failed to meet the heavy burdens of persuasion and production to establish that the "factor of sex" had "no part of the basis" for the wage differential. Brennan, 523 F.2d at 1031; see Buntin, 134 F.3d at 799. Indeed, the factual basis of how WillScot set Thornhill's, Sgroi's, and Corby's salaries, among others, are hotly disputed. On one hand, WillScot relies on Prack's testimony that experience—both within the company, and prior to coming to WillScot or Mobile Mini—impacts how much NAMs are paid.[7] (Doc. No. 31-3 at 207:18–208:1). To further demonstrate that experience levels explain Thornhill's base salary being lower than her male colleagues', WillScot also relies upon Prack's testimony that Thornhill's starting pay was based on her experience in her resume (id. at 208:13–18) and Prack's declaration stating that all of Thornhill's male Mobile Mini NAM colleagues had more experience than her prior to becoming Mobile Mini NAMs. (Doc. No. 31-5 at ¶¶ 9–16, Ex. B). On the other hand, Thornhill points to evidence that experience levels may not account for the wage disparity. For example, Thornhill references Prack's testimony that she does not know what considerations factored into setting the Mobile Mini NAMs' base salaries. (Doc. No. 31-3 at 49:2–51:10, 213:4–23). Further, Prack concedes that she did not ever speak to the Mobile Mini NAMs' hiring managers to determine why they set their salaries at their differing base levels. (Id. at 50:4–18).

---

[7] To the extent Thornhill contends this testimony is inadmissible evidence (Doc. No. 43 at 3), that is an issue best resolved at trial.

WillScot is correct that "industry-related experience is a 'factor other than sex' and may legitimately explain wage differentials for otherwise equal work." Murphy v. Ohio State University, 549 F. App'x 315, 318 (6th Cir. 2013) (internal citation and quotations omitted). And, to be sure, WillScot has presented evidence of both Thornhill's and the male Mobile Mini NAMs' experience that support its affirmative defense that it paid the male Mini Mobile NAMs higher wages based on their prior experience. (See, e.g., Doc. No. 31-5). However, WillScot has failed to carry its heavy burden of demonstrating that "the record shows that [WillScot] established the defense so clearly that no rational jury could have found to the contrary" such that it is entitled to summary judgment on its defense. Beck-Wilson, 441 F.3d at 365 (internal citation and quotations omitted). The factual issues surrounding WillScot's affirmative defense—including whether the male Mobile Mini NAMs had more experience than Thornhill, and whether WillScot relied on experience in setting base salaries—are best resolved by a jury, not this Court. See Anderson, 477 U.S. at 249.

Importantly, an EPA plaintiff "bears the burden of *producing* evidence of pretext solely where a reasonably jury viewing the defendant's evidence could find only for the defendant[.]" Buntin, 134 F.3d at 799 n.7. Because WillScot has not carried its "burden of persuasion" here, Beck-Wilson, 441 F.3d at 365, Thornhill need not present evidence of pretext to survive summary judgment. See id. (to survive summary judgment, an EPA plaintiff "need not set forth evidence from which a jury could infer that the employer's proffered reason for the wage differential is pretextual") (quoting Buntin, 134 F.3d at 799). Accordingly, WillScot's motion on Thornhill's EPA wage discrimination claim fails here. See Beck-Wilson, 441 F.3d at 365.

## B. Title VII & THRA Claims

WillScot next argues that it is entitled to summary judgment on Thornhill's Title VII and THRA gender-based wage discrimination claims. (Doc. No. 29 at 17). The Court evaluates both claims under the McDonnell Douglas framework. See McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); see also Tenn. Code Ann. § 4–21–311 (2011). When a plaintiff raises EPA, Title VII and THRA wage discrimination claims, as Thornhill does here, "a finding of liability under the Equal Pay Act requires a similar finding of liability under Title VII [and the THRA] where [the] claims present the same conduct and evidence." Buntin, 134 F.3d at 801; see Tenn. Code Ann. § 4–21–311 (2011). The Sixth Circuit has held that, in the context of summary judgment, "[w]hen a plaintiff defeats a defendant's motion for summary judgment pertaining to her EPA claim by raising a genuine issue of material fact as to [the] defendant's affirmative defenses, she also defeats the defendant's motion for summary judgment concerning a parallel Title VII claim." Vehar v. Cole Nat. Grp., Inc., 251 F. App'x 993, 1002 (6th Cir. 2007) (internal citation omitted); see id. ("We have held previously that a Title VII claim of wage discrimination is coextensive with a claim under the EPA insofar as the former incorporates the EPA's affirmative defenses.") (citing Beck-Wilson, 441 F.3d at 369). In the instant case, Thornhill's EPA, Title VII and THRA wage discrimination claims rely on the same conduct—Thornhill's complaints about her lower wages, and WillScot's subsequent termination of her employment—and same related evidence. (See generally Doc. Nos. 8, 29, 35, 38, 43). Thus, because Thornhill has raised a genuine dispute of material fact on WillScot's affirmative defense to her EPA gender-based wage discrimination claim, WillScot is not entitled to summary judgment on Thornhill's Title VII and THRA gender-

14

based wage discrimination claims.[8]  See Vehar, 251 F. App'x at 1002; see also supra, Section III.1.A.

### 2. Retaliation Claims

WillScot next moves for summary judgment on Thornhill's EPA, Title VII, and THRA retaliation claims.  (Doc. No. 29 at 19).  EPA, Title VII, and THRA "[c]laims asserting retaliation based on circumstantial evidence," as Thornhill raises here, "are analyzed under the McDonnell Douglas burden-shifting framework."  Briggs v. University of Cincinnati, 11 F.4th 498, 514 (6th Cir. 2021) (applying this framework to Title VII and EPA retaliation claims); see Tenn. Code Ann. § 4–21–311 (2011).

### A. Prima Facie Case

WillScot argues that Thornhill cannot establish her prima facie case of retaliation.  To establish a prima facie case of retaliation, Thornhill must establish that she (1) "engaged in a protected activity"; (2) her "exercise of such protected activity was known by" WillScot; (3)

---

[8] It is not lost on the Court that Thornhill's EPA, Title VII, and THRA gender-based wage discrimination claims are not identical.  As the Vehar court aptly noted,

> We are aware that the EPA's and Title VII's burdens of proof are not wholly interchangeable and in the rare, very close case, a plaintiff can succeed on an EPA claim while failing simultaneously to establish a Title VII claim. See, e.g., Woods v. The Univ. of the South, No. 4:00–cv–16, 2001 WL 34079320, at *6–7 (E.D. Tenn. Nov. 8, 2001). This [C]ircuit, however, has rejected this logic as "overly technical." Korte v. Diemer, 909 F.2d 954, 959 (6th Cir. 1990). More importantly, the present matter does not hinge on such a close set of facts as to require separate analysis under the EPA and Title VII.

Vehar, 251 F. App'x at 1002 n.3.  As in Vehar, the Court finds the facts here are almost wholly disputed, as evidenced by the various objections to WillScot's 85 separate statements of fact, and the parties' exhaustive briefing.  (Doc. Nos. 29, 35, 36, 38, 43).  Accordingly, to do an analysis of Thornhill's Title VII and THRA wage discrimination claims separate from the EPA analysis would be "overly technical."  Korte, 909 F.2d at 959.  More importantly, that analysis would lead to the same result—a finding that there are genuine disputes of material fact relating to those claims that are best resolved by a jury.  See Vehar, 251 F. App'x at 1002 n.3.

WillScot subsequently "took an action that was 'materially adverse' to" Thornhill; and (4) "a causal connection existed between the protected activity and the materially adverse action." Rogers v. Henry Ford Health Sys., 897 F.3d 763, 775 (6th Cir. 2018) (quoting Laster v. City of Kalamazoo, 746 F.3d 714, 730 (6th Cir. 2014)). WillScot challenges only the first and fourth prongs of Thornhill's prima facie case. (Doc. No. 29 at 19–24). The Court will address each separately.

### a. First Prong: Protected Activity

The Court first turns to WillScot's assertion that Thornhill cannot establish the first prong of her prima facie claim for retaliation, that she engaged in a protected activity. (Doc. No. 29 at 19). "[A]n employee is protected against employer retaliation for opposing any practice that the employee reasonably believes to be a violation" of Title VII, the EPA, or the THRA. Johnson v. University of Cincinnati, 215 F.3d 561, 579 (6th Cir. 2000); see Briggs, 11 F.4th at 514; see also Tenn. Code Ann. § 4–21–311 (2011). WillScot argues that Thornhill did not make her complaints based on a reasonable belief that Sgroi's higher salary was based on gender-based discrimination, and therefore did not engage in protected activity.[9] (Doc. No. 29 at 21). Specifically, WillScot argues that Thornhill did not reasonably believe that WillScot gave her lower wages than Sgroi based on her gender, given she acknowledged Sgroi's higher salary came from his superior experience. (Id.). In support of that argument, WillScot relies on part of a text message Thornhill sent in July 2022 discussing Sgroi's salary, where she states: "I don't care if he has more sales experience than me overall outside of the company[.]" (Doc. No. 31-4 at 34).

---

[9] Importantly, WillScot does not contest that the subject matter of the complaints—gender-based wage discrimination—is a practice that an individual could reasonably believe violates Title VII. (See Doc. Nos. 29, 38; see also Doc. No. 31-1; Doc. No. 36 ¶ 44; Doc. No. 37-4 at 19:15–20:20).

While a generous reading of Thornhill's text message could suggest Thornhill knew Sgroi did in fact have more experience than her before hiring, and therefore did not actually have a reasonable belief that WillScot participated in gender-based wage discrimination, there is ample evidence to the contrary. The Court need not look further than the next sentence in the same text message to see a genuine dispute of material fact on whether Thornhill reasonably believed she experienced gender-based wage discrimination. In the following sentence, Thornhill states: "I do the EXACT same job and have done it longer." (Id.). Viewing this in Thornhill's favor, a reasonable juror could conclude that Thornhill reasonably believed her longer tenure as a NAM warranted her having a higher salary than Sgroi, irrespective of past experience. The reasonableness of this belief is fortified by evidence that Thornhill had previously gotten a NAM promotion over Sgroi. (Doc. No. 31-3 at 139:9–20).

Should that not be enough to establish the first prong of Thornhill's prima facie case, Thornhill's July 2022 complaint demonstrates that Thornhill reasonably thought WillScot gave her lower wages because of her gender. Specifically, in Thornhill's complaint to Weaver, she tells him that the hiring manager that created her salary, Sheffield, "was the same person who asked if I planned to have children when it was mentioned I was interested in being a NAM," and he "was the same person who set the over 125k salary for a different male colleague." (Doc. No. 31-1 at 76). Viewing all this evidence in Thornhill's favor, the Court finds there is a genuine dispute of material fact on whether Thornhill reasonably believed she experienced wage-based gender discrimination when she made her complaints.

WillScot nevertheless contends that Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268 (2001) requires dismissal, given Thornhill's admissions about her male colleagues' superior prior sales experience demonstrates she could not have reasonably believed the wage disparity was gender-

17

based. (Doc. No. 38 at 4–5). The Court disagrees. In <u>Breeden</u>, the employee asserted that her employer retaliated against her after she complained about an interaction between her and her supervisor, which was described as:

> On October 21, 1994, respondent's male supervisor met with respondent and another male employee to review the psychological evaluation reports of four job applicants. The report for one of the applicants disclosed that the applicant had once commented to a co-worker, "I hear making love to you is like making love to the Grand Canyon" . . . At the meeting respondent's supervisor read the comment aloud, looked at respondent and stated, "I don't know what that means." [] The other employee then said, "Well, I'll tell you later," and both men chuckled.

<u>Breeden</u>, 532 U.S. at 269 (internal citation omitted). The Supreme Court reversed the Ninth Circuit's holding that the respondent's complaint about this incident was protected activity under Title VII. The Court reasoned that "[n]o reasonable person could have believed that the single incident" violated Title VII's standard on sexual harassment, <u>id.</u> at 271, which must be so "severe or pervasive" as to "alter the conditions" of employment. <u>Faragher v. Boca Raton</u>, 524 U.S. 775, 786 (1998) (internal quotations omitted).

WillScot's reliance on <u>Breeden</u> is misplaced for various reasons. At the heart of the Supreme Court's holding in <u>Breeden</u> is the "severe or pervasive" standard that applies to Title VII sexual harassment cases. <u>See</u> <u>Breeden</u>, 532 U.S. at 271. WillScot has provided no authority, nor is the Court aware of any, applying that standard to wage discrimination cases. (<u>See</u> Doc. No. 29). WillScot's contention that the differing standard in <u>Breeden</u> "is not dispositive" does not hold water, as one certainly cannot separate the alleged Title VII violation from the related "reasonable belief" analysis. (Doc. No. 38 at 4). In fact, the <u>Breeden</u> Court found that the former informed the latter, as it held the respondent's belief that she experienced sexual harassment was not reasonable *because* no reasonable person would find a single incident "severe or pervasive" in nature. <u>Breeden</u>, 532 U.S. at 271. Without authority instructing that the reasonableness of

18

Thornhill's belief should be evaluated under the standard in <u>Breeden</u>, the Court is not inclined to impose that standard here. <u>Breeden</u> is irrelevant here. Thornhill has carried her burden of establishing the first prong of her prima facie case for the purposes of summary judgment.

### b.  Causal Connection

WillScot also challenges the fourth prong of Thornhill's prima facie case, that there is a causal connection between the protected activity (Thornhill complaining about gender-based wage discrimination) and the materially adverse action (WillScot terminating Thornhill). <u>See Laster</u>, 746 F.3d at 730. To establish a causal connection, Thornhill "must produce sufficient evidence from which one could draw an inference that [WillScot] would not have taken the adverse action against [Thornhill] had [Thornhill] not engaged in activity that Title VII protects." <u>Abbott v. Crown Motor Co., Inc.</u>, 348 F.3d 537, 543 (6th Cir. 2003). "Although no one factor is dispositive in establishing a causal connection, evidence that the defendant treated the plaintiff differently from identically situated employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation." <u>Allen v. Michigan Dep't of Corr.</u>, 165 F.3d 405, 413 (6th Cir. 1999). Ultimately, "at the *prima facie* stage the burden is minimal, requiring [Thornhill] to put forth some evidence to deduce a causal connection between the retaliatory action and the protected activity and requiring the court to draw reasonable inferences from the evidence, providing it is credible." <u>Nguyen v. City of Cleveland</u>, 229 F.3d 559, 566 (6th Cir. 2000) (internal citation and quotations omitted).

WillScot contends Thornhill cannot establish a causal connection because the time elapsed between Thornhill's complaint to Weaver and her termination, four months, is too long to establish

a causal connection on account of temporal proximity.[10]  (Doc. No. 29 at 21).  Thornhill disagrees, arguing that temporal proximity alone is enough to find a causal connection here, given it was only one month between her complaint to Burch and her termination.  Again, the Court agrees with Thornhill that the one-month period between her complaint to Burch and WillScot terminating her employment establishes a causal connection for the purposes of summary judgment.

The Sixth Circuit has instructed that when the protected activity and retaliatory act are close in temporal proximity, "no other evidence is needed" to establish the fourth prong of a plaintiff's prima facie case for retaliation.  Taylor v. Geithner, 703 F.3d 328, 339 (6th Cir. 2013) ("[I]f there is a very close temporal proximity, then no other evidence is needed.").  True, WillScot asserts a four-month gap between the protected activity and the allegedly retaliatory act: Thornhill lodged her original complaint with Weaver on July 20, 2022 (Doc. No. 31-1 at 78), yet WillScot did not terminate her employment until nearly four months later (Doc. No. 36 ¶ 63).  WillScot is correct that discharge "four months after filing a discrimination claim is insufficient to support" an inference of retaliation.  Cooper v. City of North Olmsted, 795 F.2d 1265, 1272 (6th Cir. 1986); see Mickey v. Zeider Tool and Die Co., 516 F.3d 516, 525 (6th Cir. 2008) ("[W]here some time elapses between when the employer learns of a protected activity and the subsequent adverse

_____

[10] WillScot also argues that Adair v. Charter County of Wayne, 452 F.3d 482, 491 (6th Cir. 2006) instructs that the RIF "strongly negates" Thornhill's assertion of causation.  (Doc. No. 29 at 2). The Court is not convinced.  In Adair, twenty-five police officers asserted retaliation claims for Wayne County changing its pager policy after the officers filed suit for overtime wages.  The Adair court upheld the district court granting summary judgment for Wayne County on the retaliation claim, given the pager policy changes "were imposed on officers not involved in the lawsuit," which "strongly negat[ed] the argument that airport management's actions were motivated by the filing of the suit."  Adair, 452 F.3d at 485, 491.  The global policy change in Adair is a far cry from the RIF at issue here, which the parties vigorously dispute the validity of and undisputably did not apply to all employees at WillScot.  (See, e.g., Doc. No. 31-2 at 85:2–3, 82:2–6).

20

employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality.").

However, WillScot fails to account for all of the complaints Thornhill made to her superiors about the wage disparity, especially those after July 20, 2022. Thornhill argues she engaged in three protected activities: her complaints to Weaver in July 2022; to her boss, Surmacz, in August 2022; and to her supervisor, Burch, in October 2022. (Doc. No. 35 at 21). In support of her argument that only a month passed between the protected activity and her termination, Thornhill references testimony from Burch and correspondence between him and Surmacz showing that she complained to Burch about unfair compensation on October 17, 2022. (Doc. No. 37-4 at 19:15–20:20, 24:8–21; Doc. No. 37-5). This occurred exactly one month before her termination on November 17, 2022. (Doc. No. 36 ¶ 63; Doc. No. 31-1 at 196:13–18). Viewing these facts in Thornhill's favor and considering the low burden on Thornhill at this stage of the case, Nguyen, 229 F.3d at 566, the one-month period between her complaint to Burch and WillScot terminating her employment is more than sufficient evidence to establish an inference that the former caused the latter. See Herra v. Churchill McGee, LLC, 545 F. App'x 499, 502 (6th Cir. 2013) (one month proximity was sufficient to establish causal connection); see also Goller v. Ohio Dep't of Rehab. & Corr., 285 F. App'x 250, 257 (6th Cir. 2008) (two-month proximity was sufficient).[11]

## B. Legitimate, Non-retaliatory Reason

Given Thornhill has created a genuine dispute of material fact on her prima facie case for retaliation, the burden shifts back to WillScot to articulate a legitimate, non-retaliatory reason for

---

[11] It is worth noting that even the three-month period between Thornhill's complaint to Surmacz and Thornhill's termination may be close enough in time to establish a causal connection. See Singfield v. Akron Metro. House. Auth., 389 F.3d 555, 563 (6th Cir. 2004) (three-month proximity sufficient to establish causal connection).

terminating Thornhill's employment.  See Rogers, 897 F.3d at 777.  Surprisingly, WillScot fails

to do so.  (Doc. No. 29 at 19–25 (discussing only the prima facie case and pretext)).  Still, both the

Court and Thornhill (see Doc. No. 35 at 23) can surmise that WillScot's legitimate, non-retaliatory

reason for terminating Thornhill's employment is that Surmacz selected her for the RIF due to her

inadequate skillset.  (Doc. No. 31-2 at 85:2–6).  Thornhill asserts that the RIF WillScot relies on

was not actually a RIF at all, and instead is a coverup for WillScot improperly terminating her.

(Doc. No. 35 at 23).   She supports this argument by noting that WillScot replaced both her and

Lorino after it terminated their employments.  (Id.).

Setting aside that Thornhill's argument is better left to the pretext analysis, the Court

nevertheless finds WillScot has (albeit poorly) established a legitimate, non-retaliatory reason for

terminating Thornhill.  True, as Thornhill states, the record contains evidence that WillScot

replaced Thornhill and Lorino after their terminations (Doc. No. 31-2 at 109:9–16, 110:13–21,

112:12–15), suggesting that Thornhill may not truly have been terminated because of a RIF.  See

Barnes v. GenCorp Inc., 896 F.2d 1457, 1465 ("An employee is not eliminated as part of a work

force reduction when he or she is replaced after his or her discharge.").  Still, there is evidence in

the record sufficient to articulate that the RIF took place, including: WillScot undergoing a post-

merger restructuring in November 2022, the same month WillScot terminated Thornhill's

employment (Doc. No. 31-2 at 135:8–12); WillScot deciding to exit 78 employees from the

organization as part of a RIF (id. at 71:12–15; 71:20–24, 135:7–12); and Burch and Prack

informing Thornhill she would be terminated pursuant to the RIF (Doc. No. 36 ¶ 63).  Further,

there is evidence in the record that Surmacz selected Thornhill for the RIF because she lacked the

skillset needed going forward (Doc. No. 31-2 at 85:2–6), and that Thornhill and Lorino's alleged

replacements had different experience and skills Surmacz's team needed (Doc. No. 36 ¶¶ 78–79).

See Barnes, 896 F.2d at 1465 ("[A] person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work."). Given the disputed facts presented on this issue, the Court finds WillScot has established a legitimate, non-retaliatory reason for Thornhill's termination.

## C. Pretext

Because WillScot has raised a legitimate, non-retaliatory reason for terminating Thornhill's employment, the burden shifts back to Thornhill to demonstrate that the proffered reason is "'actually a pretext to hide unlawful retaliation.'" Rogers, 897 F.3d at 777 (quoting Michael v. Caterpillar Fin. Servs. Corp., 496 F.3d 584, 597 (6th Cir. 2007)). Thornhill can establish pretext "by showing that the proffered reason [] (1) had no basis in fact; (2) was insufficient motivation for the employment action; or (3) did not actually motivate the adverse employment action." Joostberns v. United Parcel Servs., Inc., 166 F. App'x 783, 790–91 (6th Cir. 2006) (citing Smith v. Chrysler Corp., 155 F.3d 799, 805–06 (6th Cir. 1998)). At summary judgment, Thornhill meets her burden of establishing pretext by "'produc[ing] evidence sufficient that a reasonable finder of fact could reject the employer's proffered reason.'" Rogers, 897 F.3d at 777 (quoting Michael, 496 F.3d at 597).

WillScot argues that Thornhill cannot establish pretext because the evidence in the record undisputably shows that WillScot selected her for the RIF because she could not perform the necessary job skills going forward. (Doc. No. 29 at 24–25). In support, WillScot presents Surmacz's testimony stating as much. (Doc. No. 31-2 at 80:25–81:7, 85:1–7). Thornhill disputes that she did not have the skills to continue being a NAM at WillScot, contending that her experience and job competency demonstrate Surmacz did not select her for the alleged RIF based

23

on merit. (Doc. No. 35 at 24–25). Specifically, Thornhill argues that Surmacz's belief that Thornhill did not have the skillset needed going forward was unjustified because of Thornhill's "middle of the pack" performance, job qualifications, and long tenure at Mobile Mini. (Doc. No. 35 at 25).

Thornhill's evidence of her job competency carries little weight considering the Sixth Circuit's "'honest belief' rule with regard to [WillScot's] proffered reason for discharging" Thornhill. Majewski v. Automatic Data Processing, Inc., 274 F.3d 1106, 1117 (6th Cir. 2001) (internal citation omitted). "Under [the 'honest belief'] rule, as long as [WillScot] has an honest belief in its proffered [non-retaliatory] reason for discharging [Thornhill], [she] cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect." Id. (internal citation omitted). While Thornhill presents evidence that she had the ability to continue being a NAM at WillScot, she has not presented any evidence that Surmacz did not honestly believe otherwise. Without evidence calling into question whether Surmacz truly believed Thornhill lacked the requisite qualifications moving forward, it is not the Court's role to substitute WillScot's judgment for its own. See Majewski, 274 F.3d at 1117. Accordingly, Thornhill cannot rely on her credentials or job performance to show pretext. See id.

That aside, Thornhill has still come forth with sufficient evidence such that a reasonable juror could determine that WillScot's reason for terminating Thornhill's employment, her limited skillset, was either not based in fact or was insufficient to explain her termination. First, Thornhill cites to evidence showing that her termination was not a true "reduction in force," given WillScot quickly replaced her after her firing. See supra, Section III.2.B. Second, Thornhill alleges that her superiors' "gendered" comments, her disparate treatment in the workplace, and WillScot's poor handling of Thornhill's complaints further establish pretext (Doc. No. 35 at 25). This

evidence includes, among other things: Sheffield assigning stereotypical "female" businesses to Thornhill, while assigning more lucrative clients to male NAMs (Doc. No. 37-1 ¶ 12); Sheffield making "denigrating" remarks in meetings, such as calling women "fickle" (Doc. No. 37-2 at 71:21–72:4); Sheffield asking Thornhill if she planned to have children before promoting her to NAM (id. at 70:11–71:20); Surmacz calling Thornhill a "smart girl" and a "manipulative little gossip" (id. at 100:13–18, 101:10–21); and Surmacz excluding Thornhill from event planning and interviews (id. at 109:5–11, 167:20–168:11). True, WillScot's allegedly discriminatory practices are not directly linked to her termination. Still, Thornhill's suggestion that these pieces of evidence shed light on the true reason for her termination—her complaints about gender-based salary disparities—has merit, and such evidence is best weighed by a jury at trial. See Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 356 (6th Cir. 1998) ("Although discriminatory statements by a nondecision maker, standing alone, generally do not support an inference of discrimination, the comments. . . are not categorically excludable. . . such evidence does tend to add 'color' to the employer's decisionmaking processes and to the influences behind the actions taken with respect to the individual plaintiff.") (internal citation omitted).

In total, viewing these facts together and in Thornhill's favor, she has produced evidence showing: the hiring manager who promoted her to NAM made "gendered" comments to her and others; she worked under a boss who made similar comments about her, and gave male NAMs better opportunities; and WillScot quickly replaced her after her termination, despite WillScot employees informing Thornhill that WillScot terminated her employment due to a RIF. If such evidence is believed by the trier of fact, it could lead a reasonable juror to conclude that WillScot choosing to terminate Thornhill as part of a RIF due to her limited skillset had no basis in fact, or is insufficient to explain her termination. See Abbott v. Crown Motor Co., Inc., 348 F.3d 537, 544

25

(6th Cir. 2003).  Accordingly, WillScot has failed to establish it is entitled to summary judgment on the merits on Thornhill's EPA, Title VII, and THRA retaliation claims.

### 3. Sex Discrimination Claims

WillScot's final argument is that it is entitled to summary judgment on Thornhill's Title VII and THRA gender-based termination claims.  (Doc. No. 29 at 25).  In only a paragraph, WillScot opposes these claims on two grounds.  First, WillScot argues that Thornhill does not proffer statistical evidence regarding the RIF, as it asserts she is required to do to support her gender-based termination claims.  (Doc. No. 29 at 25).  Despite Thornhill's failure to respond to WillScot's first argument (see Doc. No. 35 at 18–25), the Court nonetheless finds it unpersuasive. WillScot's argument that Thornhill must rely on statistical evidence is based on Slapak v. Tiger Mgmt. Grp., LLC, 594 F. App'x 290, 295 (6th Cir. 2014).   In Slapak, the Sixth Circuit stated that: "[i]n a work force reduction case . . . the plaintiff [must] show 'additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons.'"  Id. (citing Barnes, 896 F.2d at 1465).  However, this applies only where it is a "true work force reduction case."  Barnes, 896 F.2d at 1465.  The Court has already determined that the validity of the RIF, and whether WillScot truly terminated Thornhill as part of a RIF, are disputed facts best resolved by the jury.  See supra, Section III.2.  Accordingly, Thornhill did not need to produce statistical evidence at this stage of proceedings for her gender-based termination claims to proceed.  See Barnes, 896 F.2d at 1465.

Second, WillScot argues in a single sentence that Thornhill cannot establish pretext for the same reasons she cannot establish pretext for her retaliation claims.  (Doc. No. 29 at 25).  For such a conclusory argument, the Court need not revisit a similar analysis only to determine the same result.  All the evidence Thornhill presents to show pretext for her retaliation claims applies equally

to her gender-based termination claims.  See supra, Section III.2.C.  Thus, viewing the evidence in the light most favorable to Thornhill, WillScot's pretext argument fails for the reasons discussed above.  See id.  Because WillScot does not challenge Thornhill's gender-based discrimination claims on any other grounds, the Court need not evaluate Thornhill's additional arguments on this claim.  WillScot's motion on these claims will be denied.[12]

## IV.    CONCLUSION

For the foregoing reasons, WillScot's Motion for Summary Judgment (Doc. No. 28) will be denied.

An appropriate order will enter.

_____
WAVERLY D. CRENSHAW, JR.
UNITED STATES DISTRICT JUDGE

---

[12] In its reply, WillScot argues Thornhill cannot establish the fourth prong of her prima facie case for her gender-discrimination claims.  (Doc. No. 38 at 3–4).  Because WillScot failed to raise this in its opening brief (see Doc. No. 29), it waived the argument.  See Swain v. Comm'r of Soc. Sec., 379 F. App'x 512, 517 (6th Cir. 2010) (affirming district court's finding that a claimant waived arguments not raised in merits brief).  The Court will not consider WillScot's belated argument here.